# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

## CLIFTON GOOLSBY v. UPPER CUMBERLAND OIL, INC.

**Direct Appeal from the Circuit Court for Jackson County**
**No. 1285-0-241      Bobby Caper, Judge**

---

**No. M1998-00986-COA-R3-CV  - Decided May 12, 2000**

---

This case concerns a lessee's attempt to renew a lease after the expiration of the lease term and in the absence of language in the lease designating a specific time frame for renewal. Upon the written findings of the trial court we hold that the lessee failed to exercise its option to renew the lease despite its tender of the increased rent due under the renewal option. In keeping with our Supreme Court's opinion in *Norton v. McCaskill*, 12 S.W.3d 789 (Tenn. 2000); we affirm the trial court's determination on the record that Lessee is a holdover tenant for the period of one year .

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed.**

CAIN, J., delivered the opinion of the court, in which CANTRELL, P.J., M.S., and KOCH, J., joined.

William Joseph Butler, Lafayette, Tennessee, for the appellee, Clifton Goolsby.

David Day, Cookeville, Tennessee, for the appellant, Upper Cumberland Oil, Inc.

## OPINION

On the first day of June, 1982, Clifton Goolsby and wife Ann Goolsby, by written agreement, leased to Upper Cumberland Oil, Inc., certain real estate in the City of Gainesboro, Jackson County, Tennessee, for operation of a service station. The lease provided in part:

> The term of this lease shall be for a period of five (5) years which shall commence on the first day of June, 1982 and end on May 31, 1987. At the expiration of the original lease term, the Lessors hereby grant unto the Lessee the exclusive right and option to renew the terms of this lease for an additional five (5) year period and at the conclusion of the first option period if exercised by the Lessee, the Lessors shall grant to the Lessee an additional exclusive option to be called the second option

period for five (5) additional years, thereby making the described premises available to the Lessee for a total of fifteen (15) years including the first original five year term with two separate five year options, if exercised by the Lessee.

The Lessee shall pay to the Lessors the sum of Seven Hundred ($700.00) Dollars per month during the original five year term of this agreement and the Lessee shall thereafter pay the sum of Eight Hundred ($800.00) Dollars per month as rent during the first five year option, if exercised, and the Lessee shall pay to the Lessors the sum of Nine Hundred ($900.00) dollars per month as rent during the second five year option period, if the Lessee elects to exercise said options. Monthly rental payments shall be made payable in advance with the first such monthly rental payment becoming due on June 1, 1982 and being payable no later than June 15, 1982, and said rental payment shall be made on like dates each month thereafter until the terms of this agreement shall expire. In addition to the rents heretofore specified, the Lessee shall be responsible to pay any and all real estate taxes assessed against the described property.

On January 16, 1987, before the expiration of the original term of the lease, the parties entered into an addendum providing in part as follows:

At the conclusion of the second option, the Lessors hereby grant unto the Lessee the exclusive right and option to renew the terms of this lease for an additional five (5) year period to be called the third option period, thereby making the described premises available to the Lessee for a total of twenty (20) years.

If the Lessee elects to exercise the third option period of five (5) years, then and in that event the Lessee shall pay to the Lessors the sum of One Thousand ($1,000.00) Dollars per month payable on the same terms as provided in the original lease agreement.

It is agreed and understood that the Lessee shall have the right to purchase the above described real property and all improvements located thereon at a total purchase price of the sum of One Hundred Twenty Five Thousand ($125,000.00) Dollars. This option to purchase shall be exercised by the Lessee giving written notice upon the Lessors of its election to purchase said property any time within sixty (60) days prior to the expiration of the third option period. The terms of purchase shall be cash paid to the Lessors at closing. Closing shall occur on or before the expiration date of the third option.

Champ Goolsby, father of Clifton Goolsby, owned a tract of land immediately adjacent to the service station tract. Champ Goolsby entered into a lease agreement with Upper Cumberland Oil, Inc. on January 16, 1987, leasing this adjacent tract to Upper Cumberland for an initial term extending from February 1, 1987 through May 31, 1992. This lease provided in pertinent part:

The rent during the lease period shall be Fifty ($50.00) Dollars per month payable in advance with the first payment coming due on February 1, 1987, and being payable no later than February 15, 1987. Said rental payments shall be made on like dates each month thereafter.

At the expiration of the original lease term, the Lessor hereby grants unto the Lessee the exclusive right and option to renew the terms of this lease for an additional five (5) years at the same monthly rental. At the end of the first five (5) year option, if exercised by Lessee, the Lessor grants unto the Lessee a second exclusive five (5) year option at the same monthly rental of Fifty ($50.00) dollars per month, thereby making the premises described hereinabove available to the Lessee for a total of fifteen (15) years and four (4) months assuming the two separate options are exercised by the Lessee.

Clifton Goolsby and wife Ann Goolsby purchased this adjacent tract from the heirs of Champ Goolsby on January 26, 1992, by deed which provided in part: "RESERVATION: The above described premises is subject to an existing lease to Upper Cumberland Oil."

All went well between landlord and tenant until the expiration of the second option period on May 31, 1997. As provided in the January 16, 1987 amendment to the lease Upper Cumberland was granted an option the exercise of which would extend the term of the lease for five years with an option to purchase the property at the expiration of Upper Cumberland's extended term. While the original lease and the amended lease gave the lessee the unconditional option to renew, neither document provided that any advance notice be given to the lessor of the exercise of the option, and both documents were silent as to the means to be used by the lessee to exercise his option. The June 1982 lease simply provided for $700.00 per month rental during the original five year term with the rent increasing to $800.00 per month if the lessee exercised his option for the first five year term extension, and $900.00 per month if the lessee exercised the second five year option. The January 16, 1987 amendment to the lease, which granted the lessee the third option, simply provided that the rent would increase to $1,000.00 per month for the period June 1, 1997 through May 31, 2002 if the lessee exercised this third option.

Under the original lease, unchanged by the January 16, 1987 amendment, monthly rent was due in advance on the first day of each month and " ... payable no later than ... " the 15th of each month.

Yet May 31, 1997, this last day of the "second option" period, came and went with no action by the lessee to exercise the third option and no objection by the lessor to continued occupancy by the lessee after May 31, 1997. On June 10, 1997, Lessee mailed to Lessor its check for rent due for the month of June 1997 with the check representing $1,000.00 as rent for June 1997.[1]

---

[1] The June 10, 1997 check from Upper Cumberland Oil, Inc. to Clifton Goolsby was in the amount of $1,050.00. Clifton Goolsby was at that time the administrator of the Champ Goolsby

This check was endorsed by Clifton Goolsby and negotiated through Jackson Bank & Trust Company in Gainesboro, Tennessee on June 12, 1997. Rent for the month of July 1997 was paid by check July 11, 1997 and negotiated under the endorsement of Clifton Goolsby on July 14, 1997. Rent for the month of August 1997 was paid by check August 13, 1997 and negotiated under the endorsement of Clifton Goolsby on August 15, 1997.

Upper Cumberland takes the position that this case is controlled by *Carhart v. White Mantel and Tile Co.*, 123 S.W. 747 (Tenn. 1909) and that its tender on June 10, 1997 of the $1,000.00 rental for the month of June 1997, coupled with the acceptance and negotiation of its check by Clifton Goolsby, constituted an exercise by the lessee of its option to renew the lease for the period June 1, 1997 through May 31, 2002. On the other hand, Clifton Goolsby asserts that he was entitled to notice from the lessee of the exercise of the third option before the May 31, 1997 expiration of the term provided by the second option. Goolsby further insists that he notified Upper Cumberland prior to his negotiation of the June 10 check on June 12, 1997, that the lease had expired and that a new lease would be needed with the option to purchase contained in the option to extend the term from June 1, 1997 to May 31, 2002, to be deleted.

Subsequent to oral argument in this case, the Supreme Court of Tennessee settled the question of when a lessee must exercise an option to renew a lease, which is silent as to method of renewal except for a phrase similar to "at the end of" the lease. Said the Court:

> ...[W]e conclude that in the absence of a specific time designation in the lease, an option to renew remains effective only during the term of the lease. Accordingly we agree with those courts concluding that when a lease stipulates that an option to renew must be exercised "at the end of" or "at the termination of" the lease, the lessee must exercise the option on or before the day the original lease expires.

*Max Norton and Long Outdoor Advertising v. Johnny McCaskill, dba City Sign Co.,* 12 S.W.3d 789, 793-94 (Tenn. 2000).

The original lease in the case at bar provides: "At the expiration of the original lease term, the lessors hereby grant unto the lessee the exclusive right and option to renew the terms of this lease ..." thereafter providing for two five year renewal options. The January 16, 1987 amendment to the lease provided for an additional five year option in language stating: "At the conclusion of the second option, the lessors hereby grant unto the lessee the exclusive right and option to renew the terms of the lease for an additional five year period to be called the third option., thereby making the described premises available to the lessee for a total of twenty (20) years."

The record is clear that Upper Cumberland gave Clifton Goolsby no notice of any kind prior

---

estate and the additional $50.00 of the check represented the $50.00 rental payable for the month of June 1997 on the adjacent tract held by Cumberland under the Champ Goolsby lease of January 16, 1987.

to the expiration of the second option on May 31, 1997. *Norton v. McCaskill* is controlling unless the actions of the parties subsequent to the expiration of the second option afford to Upper Cumberland the kind of equitable relief recognized in *Norton v. McCaskill. See Norton*, 12 S.W.3d, at 794, (citing *South Region Indus., Inc. v. Chattanooga Warehouse & Cold Storage Co., Inc.*, 612 S.W.2d 162, 164-65 (Tenn. Ct. App. 1981).)

The original lease provided: "Monthly rental payments shall be made payable in advance with the first such monthly rental payment being due on June 1, 1982 and being payable no later than June 15, 1982, and said rental payment shall be made on like dates each month thereafter until the terms of this agreement shall expire."

Absent any "equitable circumstances" appearing of record, this fifteen day "grace period" provided by the lease is ineffective to extend the term for exercise of the third option, since failure to affirmatively exercise the third option prior to May 31, 1997 allowed the entire lease including the "grace period" provisions to expire on May 31, 1997.

The case then turns on the actions of the parties subsequent to May 31, 1997 and particularly events that occurred on June 12, 1997. At the outset of this fact-driven inquiry Appellant correctly points out that the findings of fact and conclusions of law made by the trial judge are in stark contrast to his oral findings made immediately after the conclusion of the trial. These differences, however, were brought forcibly to the attention of the trial court by the appellant in an extensive "Motion to Amend or Alter Findings of Fact, Conclusions of Law and Judgment." The trial court overruled this motion thus reaffirming its formal findings of fact and conclusions of law entered several weeks after the conclusion of the trial. On appellate review we are bound by the findings of fact of the trial judge to the extent that the evidence in the record does not preponderate to the contrary. T.R.A.P. Rule 13(d). Oral pronouncements of the trial judge are ineffective if they conflict with the judgment when it is entered of record.

Cases predating the Tennessee Rules of Civil Procedure left no room for doubt on this point, and as this court has observed:

> A judgment must be reduced to writing in order to be valid. It is inchoate, and has no force whatever, until it has been reduced to writing and entered on the minutes of the court, and is completely within the power of the judge or Chancellor. A judge may modify, reverse, or make any other change in his judgment that he may deem proper, until it is entered on the minutes, and he may then change, modify, vacate or amend it during that term, unless the term continues longer than thirty days after the entry of the judgment, and then until the end of the thirty days.

*Broadway Motor Co., Inc. v. Fire Insurance Co.*, 12 Tenn. App. 278, 280 (1930).

This rule survived the adoption of the Tennessee Rules of Civil Procedure. *Sparkle Laundry and Cleaners, Inc. v. Kelton*, 595 S.W.2d 88, 93 (Tenn. App. 1979); *Evans v. Perkey*, 647 S.W.2d

636, 641 (Tenn. App. 1982).

As observed by the Court of Appeals for the Western Section: "We do not review the court's oral statements, unless incorporated in a decree, but review the court's order and judgments for that is how a Court speaks." *Shelby v. Shelby*, 696 S.W.2d 360, 361 (Tenn. App. 1985).

The proposed findings of fact and conclusions of law entered by the trial judge on September 18, 1998 were prepared by the attorney for the plaintiff-appellee and adopted by the court. Prior to the adoption of the Tennessee Rules of Civil Procedure, this procedure was an improper action and reversible error. *Nashville, Chattanooga & St. Louis Ry. Co., et al v. Price*, 125 Tenn. 646, 148 S.W. 219 (Tenn. 1911).

The adoption of Rule 52 of the Tennessee Rules of Civil Procedure modified *Price.* The Supreme Court has held:

> Although we believe *Price* was correctly decided, we think the adoption of the Rules of Civil Procedure calls for modification of its holding. We agree that the preparation of findings and conclusions is a high judicial function. We are committed to the requirement that the trial court's findings and conclusions be its own. However, we are also aware that the thorough preparation of suggested findings and conclusions by able counsel can be of great assistance to the trial court. In an effort to strike a balance between these considerations, we hold that although it is improper for the trial court to require counsel to prepare findings, it is permissible and indeed sometimes desirable for the trial court to permit counsel for any party to submit proposed findings and conclusions. Findings prepared by the trial judge which represent his independent labor are preferable, however we do not disapprove of party-prepared findings. This is a modification of *Price* which we feel is more consonant with the Rules of Civil Procedure. We wish to point out that before adopting findings prepared by counsel, the trial judge should carefully examine them to establish that they accurately reflect his views and conclusions, and not those of counsel. He should also ascertain that they adequately dispose of all material issues, and to assure that matters not a proper part of the determination have not been included.

*Delevan-Delta Corp. v. Roberts*, 611 S.W.2d 51, 52-3 (Tenn. 1981).

The court's written order contains, inter alia, the following finding of fact and conclusion of law:

> 5.      ... that the plaintiff notified the defendant on or about June 10, 1997, of the expiration of the lease due to lack of notice to exercise the option period.
> ...

5.    On or about June 10, 1997 and prior to the plaintiff receiving a check for the new rental rate, plaintiff spoke to the president of Upper Cumberland Oil Company, Joe Moore, and informed him that his lease had terminated. The discussion concerning the lease was that the defendant could stay on the property but that a new lease was to be prepared and the defendant agreed to prepare a new lease.

It is undisputed that Upper Cumberland issued a check to Clifton Goolsby in the amount of $1,050.00 on June 10, 1997 and that this check was deposited by Goolsby to his bank account on June 12, 1997. This check represented the $50.00 payment for the separate Champ Goolsby lease and a $1,000.00 payment for June 1997 rental of the property in issue in this case. The monthly rental due for the Clifton Goolsby property during the term of the second option, June 1, 1992 through May 31, 1997, was $900.00. The rental that would have been due upon exercise of the third option would have been $1,000.00 per month for the period June 1, 1997 through May 31, 2002.

In *Carhart v. White Mantell & Tile Co.*, 123 S.W. 747 (Tenn. 1909), the landlord was seeking to hold the tenant to the exercise of an option to renew the lease when the tenant held over on the property, continuing to pay the same rental. The court held that the payment of rent in the same amount as was paid under the original lease and acceptance thereof by the lessor did not constitute a binding election by the tenant to renew the lease, though cases in some jurisdictions held otherwise. The court further observed that if the option to renew provided for an increased rental and the lessee paid such increased rental, such action evidenced an intention to exercise the option. Said the court:

> If the lease, as in this case, provides for an additional term at an increased rental, and after the expiration of the lease period the tenant holds over and pays the increased rental, this is affirmative evidence on his part that he has exercised the option to take the lease for an additional term; but where, under a lease like the present, the tenant holds over after the expiration of the original term, and does not pay the increased rental as provided by the lease, but continues to pay the original rental, which is accepted by the lessor, this negatives the idea of the acceptance of the privilege of an additional term. Under such circumstances, the lessee holding over will occupy the status of a tenant at will.

*Carhart v. White Mantel & Tile Co.*, 123 S.W. 747, 750 (Tenn. 1909).

Thus in a context of landlord seeking to hold tenant to the exercise of an option to renew, payment of increased rental by the tenant and acceptance thereof by the landlord is evidence of an option to renew but not conclusive evidence. In this case wherein the tenant seeks to assert such payment and acceptance of increased rent to essentially estop the landlord, the trial court has made an affirmative finding of fact that negates intent to renew.

Mr. Goolsby testified:

Q    Now you claim to have had a meeting with Mr. Moore in June of 1997.

A      Right.

Q      No one else was present. Correct?

A      Just me and Mr. Moore.

Q      Was this meeting in the afternoon?

A      I believe it was around ten or eleven o'clock. I'm not sure.

Q      Do you remember me asking you in your deposition to tell me everything that you recalled about the conversation that took place in Mr. Moore's office? Do you recall that?

A      Yeah.

Q      And do you recall that what you told me was that Mr. Moore ... you told Mr. Moore that the lease had run out?

A      Right.

Q      And you said Mr. Moore said, "I have?" And that's what he said, wasn't it?

...

And your answer was:

      "Well, I went in and told Mr. Moore that he had let his lease run out; and he said, 'I have?' And I said, 'Yes, sir. You didn't give me no notification that you was going to continue your lease.' And he wanted to know if he could keep it. And I said, 'You can.' "

      Do you remember telling me that?

A      Yeah, I told him he could if he'd take out the option to buy.

Q      Well, was Mr. Moore surprised when you came in his office and just told him that his lease had run out?

A      He was sort of surprised, yes, sir.

Q      And at that time, all he said was, "I have?"

A      Well, he was asking a question, "I have?" Isn't that a question?

Q      Then you said he wanted to know if he could keep the property like it was.

My question was:

      "Can you recall exactly what he said."
      Your answer was:
      "No, I couldn't."
      "Q.    Okay. What did you say after he said – "
      "A.    I told him he could keep it, but he'd have to make me a new lease and take out the option to sell it out of the new lease."

...

MR. DAY:

Q      Mr. Goolsby, it's your understanding that you told Mr. Moore in the June,

1997, meeting that he could stay on the property for the same terms less the option to purchase.

A    Correct.

So it is that Mr. Goolsby asserts that the second option, expired by its own terms on May 31, 1997, and that he so informed Mr. Moore of Upper Cumberland and then agreed that Upper Cumberland could remain in possession pending a new lease that would eliminate the option to purchase that was contained in the third option. This version is supported by the letter from Joe Moore to counsel for Mr. Goolsby, dated July 28, 1997, providing:

It was an oversight on my part that I did not contact Mr. Goolsby about the renewal option. It was and is my intent to exercise the third renewal option as provided in the addendum to lease.

Mr. Goolsby did contact me about the expired lease, allowed us to stay, and informed me that a new lease must be prepared. It is my intention to contact him within the next few days. I had planned to be in touch with Mr. Goolsby before now and certainly should have. Thank you for contacting me.

The version of the June 12, 1997 meeting between Clifton Goolsby and Joe Moore is described by Joe Moore in his testimony:

Q    I want to take you back to June of 1997. Do you recall having a meeting with Mr. Clifton Goolsby that month?
A    Yes.
Q    Do you recall that meeting being on June 12, 1997?
A    My log book says June 12.
Q    Was that meeting very long?
A    Very, very brief.
Q    Did Mr. Goolsby ever sit down?
A    No, sir.
Q    Can you tell the court what took place during that conservation?
A    Well, we made our usual friendly formalities. We're very close friends. Asked how each other was. And then he said, "Joe, your lease has run out." And I says, "It has?" And he says, "Yes, your lease has run out; but I'll be glad for you to stay and add the ongoing rental." So I says, "Well, Red, I'll pull the lease; and I will let you know something." And that was basically all that was said.
Q    In that meeting, did you ever agree with Mr. Goolsby that the lease had lapsed?
A    No, sir.

The trial court found Mr. Goolsby and Mr. Moore both to be credible witnesses. The combined effect of Mr. Goolsby's testimony and Mr. Moore's letter of July 25, 1997 was apparently

sufficient to convince the trial court that Mr. Goolsby's version of the events of June 12, 1997 was correct. When this finding is coupled with the fact that the second option had expired under *Norton v. McCaskill* on May 31, 1997, without Upper Cumberland exercising the third option we cannot say that the evidence preponderates against the finding of the trial judge and that judgment is affirmed. *Airline Constr., Inc. v. Barr*, 807 S.W.2d 247 (Tenn. Ct. App. 1990); *Foster v. Bue*, 749 S.W.2d 736 (Tenn. 1988).

Costs on appeal are assessed against Upper Cumberland Oil Company, Inc.