**Mike ELLIS**

v.

**PAULINE S. SPROUSE RESIDUARY TRUST et al.**

Supreme Court of Tennessee,
at Knoxville.

Sept. 4, 2008 Session.

March 23, 2009.

---

G. Wendell Thomas, Jr., Rob Quillin, and Catherine E. Shuck, Knoxville, Tennessee, for the appellant, Mike Ellis.

W. Tyler Chastain and Margo J. Maxwell, Knoxville, Tennessee, for the appellees, Pauline S. Sprouse Residuary Trust and Kerry M. Sprouse.

## OPINION

WILLIAM C. KOCH, JR., J., delivered the opinion of the court, in which JANICE M. HOLDER, C.J., WILLIAM M. BARKER, CORNELIA A. CLARK, and GARY R. WADE, JJ., joined.

This appeal involves the exercise of an option to extend a lease that did not specify how or when the option should be exercised. Approximately two and one-half years after the lessee believed he had exercised the option to extend the lease, the

lessor sold the property to a third party who was aware that the lessee was actively farming the property. Thereafter, the new owner trespassed on the property and ordered the lessee to vacate. The lessee complied but filed suit in the Circuit Court for Knox County seeking damages for the new owner's trespass and for the profits he would have earned had he been permitted to continue to farm the property for the remaining term of the lease. A jury determined that the lessee had effectively extended the lease and that the new owner had actual notice of the lease. Accordingly, the jury awarded the lessee $82,534 in compensatory damages and $30,000 in punitive damages. The owner appealed. The Court of Appeals upheld the jury's $534 award for damages caused by the owner's trespass but vacated the remainder of the award of compensatory damages after concluding that the lessee had not effectively extended the lease. The court also vacated the punitive damages award because it was excessive in comparison to the reduced compensatory damages award and remanded the case for a new trial on punitive damages. *Ellis v. Pauline S. Sprouse Residuary Trust*, No. E2006–01771–COA–R3–CV, 2007 WL 3121666 (Tenn.Ct.App. Oct.26, 2007). We granted the lessee's application for permission to appeal. In accordance with *Carhart v. White Mantel & Tile Co.*, 122 Tenn. 455, 123 S.W. 747 (1909), we have determined that the lessee effectively extended the lease by holding over and continuing to pay the rent required by the lease. Accordingly, we reverse the judgment of the Court of Appeals and remand the case to the Court of Appeals for further proceedings consistent with this opinion.

## I.

Mike Ellis is a farmer who owns a 177–acre farm and who works an additional 800 to 900 acres of leased farmland. In 1997, he leased a 103.3–acre tract on Arnold Road in Mascot, Tennessee, from Mary Bruce Williams Bagwell.[1] Mr. Ellis and Ms. Bagwell agreed on the terms of the lease over the telephone, and Mr. Ellis reduced their agreement to writing. The lease, written in capital letters, provided:

Lease Agre[e]ment

This lease between Mary Bruce Williams and Mike Ellis for her property at the end of Arnold Road in Mascot, Tennessee. [excluding house]

This lease will be for a per[io]d of five years with Mike Ellis having option of five ad[d]itional years

This lease will begin January 1 1997

Payment will be three thous[ ]and dollars per year due on or before January 31 of each year

(phrase "[excluding house]" in original). Mr. Ellis signed and mailed the lease to Ms. Bagwell. Ms. Bagwell, having misplaced and forgotten about the lease after she received it, signed the lease on January 25, 1999, after Mr. Ellis prompted her to do so. Mr. Ellis never recorded the lease.

Mr. Ellis farmed the sixty acres of arable farmland on the property and had every intention of extending the lease for an additional five years. In late 2001, he sowed a crop of winter wheat on the property. According to Mr. Ellis, he spoke with Ms. Bagwell by telephone "probably sometime in January [2002]" but "possibly in late December [2001]" and told her that he was exercising his option to extend the lease for an additional five years. Ms.

---

1. Ms. Bagwell resided in South Carolina and managed the property for herself and her brother and sister.

Bagwell denied that she ever talked with Mr. Ellis about exercising the option to extend the lease. There is no disagreement, however, that Mr. Ellis paid and Ms. Bagwell accepted Mr. Ellis's timely three-thousand-dollar rent payments in January 2002, January 2003, and January 2004. There is also no disagreement that Mr. Ellis continued to actively farm the leased property.

In 2004, Kerry M. Sprouse, a Knoxville real estate developer and broker,[2] became interested in the leased property. According to Mr. Ellis, when Mr. Sprouse visited the property on April 23 or 24, 2004, he told Mr. Sprouse that he had leased the property. Mr. Sprouse later denied that Mr. Ellis mentioned his lease during this conversation.

On May 10, 2004, Mr. Sprouse[3] signed a contract to purchase the property for $440,000. The contract contained a hand-written notation that admonished that the "Current lease not . . . be disturbed." Ms. Bagwell later testified that this notation referred to Mr. Ellis's lease but that she thought that Mr. Ellis's lease was year-to-year because he had not exercised his option.[4] Mr. Sprouse testified that he thought the notation referred to Mr. Ellis's interest in harvesting his crop in 2004.

On the day after she signed the contract to sell the property to Mr. Sprouse, Ms. Bagwell faxed a copy of Mr. Ellis's lease to the real estate agent handling the transaction. Ms. Bagwell and her brother and sister also executed three affidavits stating that they were in possession of the property and there were no tenants on the property. Apparently Mr. Sprouse did not see the copy of Mr. Ellis's lease prior to the closing. While he professed to rely completely on the affidavits executed by Ms. Bagwell and her siblings, he conceded that he knew that both Mr. Ellis and William Brown, who rented the house on the property, had "some interest" in the property. Mr. Sprouse received a warranty deed to the property on May 25, 2004.

In mid-June 2004, Mr. Sprouse entered the property without Mr. Ellis's permission and drove through Mr. Ellis's waist-high corn crop on his way to the river. At trial, Mr. Sprouse explained his actions by saying, "I drove on top of the land that I owned to get to the other side of the land I own." When Mr. Ellis telephoned to complain about the damage to his crop, Mr. Sprouse threatened to plow under the entire crop. Later, Mr. Sprouse offered to pay for the damage but never did so because he received Mr. Ellis's bill only a short time before litigation commenced. In September 2004, Mr. Sprouse's lawyer sent Mr. Ellis a letter demanding that he vacate the property by the end of December 2004. Mr. Ellis did so but was unsuccessful in finding comparable farmland to lease.

On January 28, 2005, Mr. Ellis filed suit against Mr. Sprouse in the Circuit Court for Knox County seeking to recover compensatory damages for the damage to his corn crop and for the profits he would have earned had he been able to continue to farm the property for the remaining two years of the lease. He also sought punitive damages. Following a two-day trial in March 2006, a jury found (1) that Mr. Ellis had effectively extended the lease for five

**2.** Mr. Sprouse testified at trial that he had "vast amounts of experience in multi-millions of dollars worth of sales and development."

**3.** Kerry M. Sprouse and McBeth N. Sprouse ultimately purchased the property as trustees of the Pauline S. Sprouse Residuary Trust, which is a named defendant in this action. For the sake of simplicity, we will refer only to Mr. Sprouse in this opinion.

**4.** Ms. Bagwell, who is not a lawyer, also testified that she thought that the original five-year lease was on "a year[-]to[-]year basis."

years, (2) that Mr. Sprouse had actual knowledge of the lease, and (3) that Mr. Sprouse had trespassed on the property or had interfered with Mr. Ellis's use and possession of the property. Accordingly, the jury awarded Mr. Ellis $534 for the damage caused by Mr. Sprouse's trespass, $82,000 for lost profits, and $30,000 in punitive damages. Mr. Sprouse perfected an appeal to the Court of Appeals.

On appeal, Mr. Sprouse asserted that the trial court had erred by instructing the jury that Mr. Ellis had a reasonable time after the expiration of the lease to exercise his option to extend the lease and that continuing to occupy the land and to pay rent raised a presumption that he had effectively exercised his option to extend the lease. Mr. Sprouse insisted that these instructions were contrary to *Norton v. McCaskill,* 12 S.W.3d 789 (Tenn.2000). He also asserted (1) that the failure to execute a new lease violated the statute of frauds, Tenn.Code Ann. § 29–2–101 (Supp. 2008), (2) that Mr. Ellis did not present sufficient proof regarding his claim for lost profits,[5] and (3) that Mr. Ellis's evidence regarding punitive damages was insufficient to warrant submitting the question of punitive damages to the jury.

The Court of Appeals found that the jury's conclusion that Mr. Ellis had effectively exercised the option to extend the lease was factually and legally unsupportable. First, the court decided that Mr. Ellis's testimony that he had informed Ms. Bagwell that he was exercising his option to extend the lease "possibly" in 2001 but "probably" in 2002 was insufficient to establish that the conversation occurred in 2001 during the original term of the lease. Second, the court concluded that Mr. Ellis's holding over by continuing to farm the property and by continuing to pay the

required rent in 2002, 2003, and 2004 could not, as a matter of law, amount to an exercise of the option to extend the lease because *Norton v. McCaskill* required Mr. Ellis to give notice of his intention to extend the lease prior to the end of 2001.

Having found that the record did not support the jury's conclusion that Mr. Ellis had extended the lease for an additional five years, the Court of Appeals affirmed the $534 damage award for the 2004 trespass but reversed the $82,000 award for lost profits in 2005 and 2006. In light of its decision to affirm only the $534 award for compensatory damages, the court vacated the $30,000 award of punitive damages on the ground that it was excessive when compared to the compensatory damage award and remanded the case for a new trial on punitive damages. The Court of Appeals did not address Mr. Sprouse's issues regarding the statute of frauds, the inadequacy of Mr. Ellis's evidence regarding lost profits, or the inadequacy of the evidence regarding punitive damages.

■ Mr. Ellis filed an application for permission to appeal with this Court. We granted the application in order to address how *Norton v. McCaskill* applies to leases that do not contain a specific provision prescribing the time and method for exercising an option to extend a lease. We have determined that *Norton v. McCaskill,* properly construed and applied, does not alter the holding in *Carhart v. White Mantel & Tile Co.,* 122 Tenn. 455, 123 S.W. 747 (1909) that, when the lease does not contain a specific provision prescribing the time and method for exercising the option to extend the lease, a lessee may effectively exercise an option to extend a lease by remaining in possession of the property

---

**5.** Mr. Sprouse did not take issue with the $534 award for the damage to Mr. Ellis's corn crop.

after the expiration of the initial term of the lease and by paying the required rent.

## II.

Almost one century ago, this Court was called upon to consider whether the lessee of a commercial building in Knoxville had effectively exercised an option to extend a lease simply by holding over after the original term of the lease expired. *Carhart v. White Mantel & Tile Co.*, 122 Tenn. 455, 123 S.W. 747 (1909). The building's owner, who lived in New York, leased the building to White Mantel & Tile Company for one year for $1,200 per year, payable monthly. The lease contained a provision stating that "[i]t is understood and agreed to that the parties of the second part are given the privilege of leasing this building two additional years ... at the rate of $1320.00 per year and $1500.00 per year, respectively, payable monthly." *Carhart v. White Mantel & Tile Co.*, 122 Tenn. at 457, 123 S.W. at 748. The lease did not contain a provision requiring the lessee to give notice to the lessor of its decision to extend the term of the lease.

Following the end of the first year, White Mantel & Tile Company continued in possession of the building but continued to pay $100 per month in rent rather than the increased rent provided for in the lease. When a dispute over the rent arose, the lessor insisted that the lessee, by holding over, had effectively exercised the option to extend the lease and, therefore, was required to pay the increased rent and was bound as a tenant for two more years. The lessee asserted that it had not exercised its option to extend the lease and that, following the initial term of the lease, it was only a month-to-month tenant obligated to pay the original rent. This Court sided with the lessee because, while the lessee had held over, it had not also paid the increased rent required by the lease. We said:

[W]e are of [the] opinion that the mere continuance of occupancy by the tenant or lessee after the expiration of the lease period is ordinarily accepted as the exercise of the option reserved in the lease to occupy the premises for an additional term. This is the presumption that ordinarily arises from the mere fact of holding over; but it is not conclusive of the lessee's intention to accept the lease for an additional term. If the lease, as in this case, provides for an additional term at an increased rental, and after the expiration of the lease period the tenant holds over and pays the increased rental, this is affirmative evidence on his part that he has exercised the option to take the lease for an additional term; but where, under a lease like the present, the tenant holds over after the expiration of the original term, and does not pay the increased rental as provided by the lease, but continues to pay the original rental, which is accepted by the lessor, this negatives the idea of the acceptance of the privilege of an additional term. Under such circumstances, the lessee holding over will occupy the *status* of a tenant at will.

*Carhart v. White Mantel & Tile Co.*, 122 Tenn. at 467, 123 S.W. at 750.

The principle that we recognized in *Carhart*—that the holding over and the continuing payment and acceptance of the agreed-upon rent creates a presumption that the lessee has effectively exercised an option to extend a lease that does not require the lessee to give notice of its decision to extend the lease—was then and continues to be the prevailing view. *Carder, Inc. v. Cash*, 97 P.3d 174, 181 (Colo.Ct. App.2003); *Corthouts v. Conn. Fire Safety Servs. Corp.*, 2 Conn.Cir.Ct. 34, 193 A.2d 909, 912 (1963); *Head v. Scanlin*, 258 Ga. 212, 367 S.E.2d 546, 548 (1988); *Sanders v. Middleton*, 112 Me. 433, 92 A. 488, 489 (1914); *Straus v. Shaheen, Inc.*, 310 Mass.

646, 39 N.E.2d 573, 574 (1942); *Enter. Co. v. Americom Corp.*, 1 Neb.App. 1125, 510 N.W.2d 537, 540–41 (1993); *Coulter v. Capitol Fin. Co.*, 266 N.C. 214, 146 S.E.2d 97, 100–01 (1966) (holding over and paying the increased rent showed an intent to exercise the option and acceptance by landlord waived notice); *Kearney v. Hare*, 265 N.C. 570, 144 S.E.2d 636, 639 (1965); *Idol v. Little*, 100 N.C.App. 442, 396 S.E.2d 632, 634 (1990); *Cusamano v. Anthony M. DiLucia, Inc.*, 281 Pa.Super. 8, 421 A.2d 1120, 1124 (1980); *Willeke v. Bailey*, 144 Tex. 157, 189 S.W.2d 477, 481 (1945); 2 Milton R. Friedman, *Friedman on Leases* § 14.301, at 914 (4th ed. 1997) ("Friedman on Leases") (noting that "[i]f a lease provides for an extension and requires no notice of election by the tenant, all courts agree that holding over by the tenant after expiration, and payment and acceptance of rent, effects the extension" but that the inference of extension can be rebutted through express communication, failure to pay increased rent, or the continued negotiation of new terms);[6] 1 Herbert Thorndike Tiffany & Basil Jones, *The Law of Real Property* § 182, n. 47 (3d ed.1939). While there is authority to the contrary,[7] we do not find it sufficiently persuasive to induce us to depart from the presumption recognized in *Carhart.*

More recently, this Court was again requested to address the manner in which an option to extend a lease should be exer-cised. *Norton v. McCaskill*, 12 S.W.3d 789 (Tenn.2000). This case involved the ten-year lease of property on which a commercial billboard had been constructed. The lease contained an option to extend the lease, stating that "City Sign Company [the lessee] reserves an option to renew this lease at the end of 10 years for a like period."[8] *Norton v. McCaskill*, 12 S.W.3d at 791. Five days after the expiration of the initial term of the lease, the owner of the property notified the lessee by letter that the lease was no longer in force because the lessee had failed to exercise its option to extend the lease. The lessee responded that it intended to exercise its option to extend the lease and tendered a check for the rent. The property owner declined to accept the check.

Meanwhile, the property owner had leased the property to another billboard company. Later, the property owner filed suit against the original lessee alleging breach of contract and trespass. Both parties sought a summary judgment. The property owner asserted that the lease terminated on June 30, 1995 [the last day of the term of the original lease], and the original lessee asserted that it had effectively exercised its option to extend the lease within a reasonable period of time following June 30, 1995. Both the trial court and the Court of Appeals held that the lease expired on June 30, 1995, because the original lessee had failed to ef-

---

**6.** *See also* 2 *Friedman on Leases* § 14.301, at 915 (noting that payment of increased rent under an option constitutes an acceptance of the option).

**7.** *Painter v. Town of Groveland*, 79 So.2d 765, 767 (Fla.1955) (finding such a presumption contrary to statute); *Branagen v. Winders & Alm*, 194 Iowa 461, 187 N.W. 440, 440–41 (Iowa 1922); *Schiltz v. Teledirect Int'l, Inc.*, 524 N.W.2d 671, 674 (Iowa Ct.App.1994) (holding there was no renewal but finding estoppel on the part of the landlord); *Elec. Sales Eng'rs, Inc. v. Urban Renewal & Cmty.*

*Dev. Agency of Paducah*, 477 S.W.2d 814, 816 (Ky.1972); *Abell v. Bishop*, 86 Mont. 478, 284 P. 525, 531 (1930); *I.X.L. Furniture & Carpet Installment House v. Berets*, 32 Utah 454, 91 P. 279, 282 (1907).

**8.** The lease also contained an automatic renewal provision. Despite the potential significance of this provision, neither party relied upon, or even mentioned, it in either the trial or appellate court. Accordingly, this Court declined to consider the clause. *Norton v. McCaskill*, 12 S.W.3d at 794–95.

fectively exercise its option to extend the lease.

The lessee appealed to this Court, contesting the lower courts' conclusion that it had not effectively exercised its option to extend the lease. In answering this question, we expressly confined our decision to "leases that require renewal 'at the end of' or 'at the termination of' the lease or that contain similar language conveying the same requirement." *Norton v. McCaskill,* 12 S.W.3d at 794. Because the lease required the lessee to extend the lease "at the end of 10 years for a like period," this Court held that the original lessee did not effectively exercise the option to extend the lease because "it did not exercise the option within the original term of the lease." *Norton v. McCaskill,* 12 S.W.3d at 794.[9] We found that the lease had already expired by the time the original lessee attempted to exercise its right to extend the lease for another ten years. *Norton v. McCaskill,* 12 S.W.3d at 794.

■■■ Despite our explicit limitation of *Norton v. McCaskill* to leases containing a provision requiring the lessee to exercise its option to extend the lease "at the end of" or "at the termination of" the lease, the Court of Appeals invoked *Norton v. McCaskill* in this case to support its conclusion that Mr. Ellis had not effectively exercised his option to extend the lease. This was error because the lease between Mr. Ellis and Ms. Bagwell did not contain a provision requiring Mr. Ellis to exercise his option to extend the lease either "at the end of" or "at the termination of" the lease or other language containing the same requirement. *Norton v. McCaskill,*

by its own terms, has no application to the lease at issue in this case.

Mr. Sprouse's argument that *Norton v. McCaskill* somehow undermines the continuing validity of *Carhart v. White Mantel & Tile Co.* is misplaced. This Court did not even mention the *Carhart* case in *Norton v. McCaskill,* and it is not our custom to cavalierly brush aside a longstanding rule of property. Other panels of the Court of Appeals have correctly noted that the principles contained in *Carhart* remain viable even after *Norton v. McCaskill* was decided. *Four Eights, LLC v. Salem,* 194 S.W.3d 484, 488–89 (Tenn.Ct.App.2005) (finding that the lessee had extended the lease by continuing to occupy the premises and to pay rent); *Goolsby v. Upper Cumberland Oil, Inc.,* 34 S.W.3d 309, 314–15 (Tenn.Ct.App.2000) (finding that *Carhart* did not apply because the lessor had conditioned its acceptance of the rent on the expectation that the parties were going to negotiate a new lease).

We have determined that the principles contained in *Carhart v. White Mantel & Tile Co.* control the outcome of this case because the lease does not contain a specific provision regarding how and when the lessee may exercise its option to extend the term of the lease. There is no dispute that Mr. Ellis remained in possession and continued to farm the property after the original term of the lease expired. There is likewise no dispute that he made the annual lease payments in 2002, 2003, and 2004 in a timely manner and in the amount required by the lease and that Ms. Bagwell accepted each of these payments. The trial court properly instructed the jury

9. Earlier in the opinion, we stated that "in the absence of a specific time designation in the lease, an option to renew remains effective only during the term of the lease." *Norton v. McCaskill,* 12 S.W.3d at 790. This statement, however, must be understood in the context in which it appears. The sentence preceding

this statement makes clear that the "lease" referred to in the statement is a lease "that does not designate a specific time frame for renewal but requires that the option be exercised 'at the end of' or 'at the termination of' the original lease term." *Norton v. McCaskill,* 12 S.W.3d at 790.

that these facts gave rise to a presumption that Mr. Ellis had effectively extended the lease. Therefore, despite the fact that Ms. Bagwell and Mr. Sprouse denied having conversations about the lease with Mr. Ellis, the record contains material evidence to support the jury's conclusion that Mr. Ellis had effectively exercised his option to extend the lease for another five years.

### III.

Mr. Sprouse argues that the rule of *Carhart v. White Mantel & Tile Co.* is contrary to Tennessee contract law. He insists that recognizing a rebuttable presumption that a lessee has effectively exercised an option to extend a lease by holding over and continuing to pay the required rent (1) effectively permits the lessee to unilaterally rewrite the terms of the lease, (2) creates confusion regarding the terms of the lease, (3) alienates the lessor's real property rights, and (4) creates a contract for the parties that was not otherwise agreed upon. While each and every one of these results would be undesirable, none of them flow from the straightforward application of *Carhart v. White Mantel & Tile Co.*

■ Contract law in Tennessee plainly reflects the public policy allowing competent parties to strike their own bargains. Steven W. Feldman, *Tennessee Practice: Contract Law & Practice* § 1:6, at 17 (2006). Tennessee's courts are "not at liberty to make a new contract for parties who have spoken for themselves." *Smithart v. John Hancock Mut. Life Ins. Co.,* 167 Tenn. 513, 525, 71 S.W.2d 1059, 1063 (1934). Accordingly, the courts do not concern themselves with the wisdom or folly of a contract, *Chapman Drug Co. v. Chapman,* 207 Tenn. 502, 516, 341 S.W.2d 392, 398 (1960), and will not relieve a party of its contractual obligations simply because the contract later proves to be burdensome or unwise. *Boyd v. Comdata Network, Inc.,* 88 S.W.3d 203, 223 (Tenn.

Ct.App.2002); 28 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 70:209, at 232 (4th ed. 2003) ("Courts are not in the business of rewriting contracts to bail out parties who have failed to prudently construct their business transactions.").

■ When the parties have reduced their agreement to writing, the law favors enforcing these contracts as written. *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.,* 521 S.W.2d 578, 580 (Tenn.1975); *Home Beneficial Ass'n v. White,* 180 Tenn. 585, 588, 177 S.W.2d 545, 546 (1944); *Sikora v. Vanderploeg,* 212 S.W.3d 277, 286 (Tenn.Ct.App.2006). In the absence of fraud, mistake, or other supervening legal reason, the courts should construe unambiguous written contracts as they find them. *Boyd v. Comdata Network, Inc.,* 88 S.W.3d at 223. Because the rights and obligations of contracting parties are governed by the law in effect when they entered into their contract, *C–Wood Lumber Co. v. Wayne County Bank,* 233 S.W.3d 263, 282 (Tenn. Ct.App.2007), the courts have recognized that

> The lex loci contractus [the law of the place of the contract] becomes as much a part of the contract as if specifically incorporated therein, and, in the absence of evidence of contrary intention, the parties must be held to have contemplated the application of that law to the terms of their agreement.

*Moak v. Continental Cas. Co.,* 4 Tenn.App. 287, 292 (1927).

The principles announced in *Carhart v. White Mantel & Tile Co.* regarding the effective exercise of an option to extend a lease that does not require the lessee to give notice of its decision to extend the lease were part of the fabric of Tennessee's law relating to lease agreements when Mr. Ellis and Ms. Bagwell entered

into their contract in 1997. Thus, these principles were part of their lease agreement unless they had bargained for and agreed to a more specific provision relating to the time and manner for Mr. Ellis to exercise his option to extend the lease beyond its initial term. Ms. Bagwell was not prevented from bargaining for a more specific provision regarding the exercise of the option. She did not, and thus her successor, Mr. Sprouse, is in no position to insist that the courts should ignore the application of *Carhart v. White Mantel & Tile Co.* to the interpretation and enforcement of the lease agreement. To do so would, in fact, vary the terms of the lease agreement.

## IV.

Because the Court of Appeals found that Mr. Ellis had failed to effectively exercise his option to extend the lease, it did not address Mr. Sprouse's assertions that the statute of frauds required the preparation of a new lease, that Mr. Ellis failed to present sufficient evidence to support his claim for lost profits, or that Mr. Ellis failed to present sufficient evidence to support his claim for punitive damages. Mr. Ellis did not address these issues in his application for permission to appeal or in his supplemental brief, and likewise Mr. Sprouse did not address these issues in the brief filed with this Court. To the contrary, Mr. Sprouse explicitly requested that the case be remanded to the Court of Appeals for the consideration of these issues should this Court disagree with the Court of Appeals' conclusion that Mr. Ellis did not effectively exercise the option to extend the lease. With the case in this posture, we find it proper to remand the case to the Court of Appeals with directions to consider and decide the issues that were pretermitted in its earlier opinion in this case.

The judgment of the Court of Appeals is reversed, and the case is remanded to the Court of Appeals for further proceedings consistent with this opinion. The costs of this appeal are taxed jointly and severally to the Pauline S. Sprouse Residuary Trust and Kerry M. Sprouse for which execution, if necessary, may issue.